**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION**

**JASON ROBINSON**                                                                                              **PLAINTIFF**

**VS.**                                                     **2:02CV00084-WRW**

**CROWN EQUIPMENT CORPORATION**                                            **DEFENDANT**

**ORDER**

This is a product liability case based on strict liability, negligence, and breach of warranty.[1]  Plaintiff's foot was crushed by a forklift, designed, manufactured, and supplied by Defendant.

Pending is Defendant's Motion in Limine to Exclude the Testimony of Thomas A. Berry, an expert witness for Plaintiff.[2]  Defendant alleges that Plaintiff's expert fails to meet the Fed. R. Evid. 702 and *Daubert*[3] standards.

On March 9, 2006, a telephone conference was held on the Motion.  Plaintiff and Defendant submitted post-conference briefs.

**I.  Background**

The accident occurred on May 18, 2001 at a plant in West Memphis, Arkansas.  It was Plaintiff's first day on the job.  At the time of the accident, Plaintiff was operating the forklift in a freezer unit, when he lost control and struck a post.  The collision caused his left foot to come out of the operator compartment as the rear of the forklift, struck another post, crushing his foot.[4]

---

[1]Doc. No. 1.

[2]Doc. No. 80.

[3]*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

[4]Ex. 1 attached to Doc. 80 (deposition testimony of Thomas Berry).

1

Plaintiff's expert, Mr. Berry, is a mechanical engineer. Defendant does not challenge Mr. Berry's engineering qualifications, but does challenge his opinion that the forklift is defective without a closed operator compartment to prevent leg and foot injuries.   Defendant argues that Mr. Berry cannot support his closed compartment theory because the same design feature has been rejected by the American National Standards Institute ("ANSI"), the American Society of Mechanical Engineers ("ASME"), and "every manufacturer of material handling equipment throughout the world."[5]   Defendant contends that an open operator compartment is not defective because it is designed to allow the operator to jump free of the forklift if it tips over or falls off a dock.  Defendant supports its argument by citing several federal cases that found expert opinions, such as Mr. Berry's unreliable.

Plaintiff counters that Mr. Berry's opinions are based on standard scientific methodology. Plaintiff also argues that closed compartments on stand up forklifts are not novel, and are accepted in the engineering community.  Plaintiff points to data relied on by Mr.  Berry showing that forklift buyers, such as Ford and K-Mart purchased forklifts with enclosed compartments, and that Defendant, and other manufacturers such as  Raymond, Hyster, Schaeff and Yale offer safety doors as an optional feature on their forklift models.[6]

 Finally, Plaintiff argues that he does not have to come up with a specific alternative design, but must show that devices such as rear doors are manufactured which protect the feet and legs of forklift operators.

I. Discussion

   A.  Fed. R. Evid. 702 and Daubert:

---

[5] Doc. 80-1, p. 2.

[6] Doc. 83-1, pp. 11-12.

2

Expert testimony must meet three prerequisites in order to be admitted under Fed. R. Evid. 702: (1) the testimony must be grounded on scientific, technical, or other specialized knowledge useful to the finder of fact; (2) the witness must be qualified; and (3) the evidence must be reliable.[7] A reliable opinion is based on valid reasoning and accepted methodology.[8] The Supreme Court's *Daubert* criteria are applicable to the admissibility of expert testimony founded on basic engineering principles,[9] i.e. when engineers are brought in to suggest that a product should have been designed differently, district courts look to *Daubert* for guidance on whether such testimony should be excluded.[10] "The *Daubert* reliability factors should only be applied to the extent that they are relevant, and the district court must customize its inquiry to fit the facts of each particular case."[11]

The Eighth Circuit applied *Daubert* standards to expert testimony in three cases that fit the issues in this case.[12] An alternative design was proposed by the expert in each of these cases.

In *Jaurequie*, Plaintiff's foot was amputated by a corn head attached to the front of a farm combine. The accident occurred when Plaintiff came too close to its moving parts. The Court found the alternative design proposed by Plaintiff's expert lacking in reliability:

> In the case at hand, Willis was prepared to testify that the corn head was unreasonably dangerous because it lacked awareness barriers. However, Willis has not attempted to construct or even draw the suggested device, much less test its utility as a safety device or its compatibility with the corn head's proper function. Nor has

---

[7]*Lauzon v. Senco Products, Inc.*, 270 F.3d 681 (8th Cir. 2001).

[8]*Daubert*, 509 U.S. at 586, 588-89.

[9]*Peitzmeier v. Hennessy Industries, Inc.*, 97 F.3d 293 (8th Cir. 1996).

[10]*Jaurequie v. Carter Manufacturing Co., Inc.*, 173 F.3d 1076, 1083 (8th Cir. 1999).

[11]*Id.* at 1083.

[12]*Jaurequie*, 173 F.3d 1076; *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997); and *Pestel v. Vermeer Manufacturing Co.*, 64 F.3d 382 (8th Cir. 1995).

he pointed to any manufacturer that incorporates awareness barriers into corn heads or similar farming machinery. In short, he has provided no basis for us to believe that his opinions are anything more than unabashed speculation. We therefore hold that the district court did not abuse its broad discretion in concluding that the proffered testimony regarding the lack of awareness barriers flunked the reliability prong of Daubert.[13]

In *Dancy,* Plaintiff was injured when his lift truck overturned and pinned his leg under the truck. The Eighth Circuit affirmed the exclusion of an expert's design theory:

> Dr. Forbes is a mechanical engineer and a professor at the University of Mississippi and was retained by Dancy in 1996. He has never designed a forklift, a lift truck, or any other similar machine; his specialty is in the field of thermal science. At his deposition, Dr. Forbes theorized that the lift truck should have had a guard to keep Dancy's leg within the lift truck's frame. Dr. Forbes had not tested this theory in any way, had not seen this type of device on a forklift or any other similar machine, and had not even designed the device he suggested would have prevented Plaintiff's injury.[14]

In *Dancy,* the Eighth Circuit noted that the plaintiff does not have the burden of proving that his "alternative safer design was available and feasible in terms of costs, practicality and technological possibility,"[15] but --

> [h]e still has the burden of proving the existence of a defect by showing that a safer alternative design actually exists. He cannot carry this burden without proving that his proposed design will actually work, and we believe that this question is beyond the ken of lay jurors.[16]

---

[13]*Jaurequie*, 173 F.3d at 1083.

[14]*Dancy*, 127 F.3d at 653-54.

[15]*Id.*

[16]*Id.*

In *Pestel,* the plaintiff slipped while walking toward a stump cutter and his right foot landed in the cutter wheel. The plaintiff's expert came up with an untested concept for a guard. The District Court excluded the testimony--the Eighth Circuit affirmed:

> [T]he Court considered whether there was any general acceptance of guards on stump cutters. The Court noted that Mr. Vidal had not performed a patent search to determine whether other guards existed or whether guards for stump cutters were feasible. He had not talked to any operators who worked with this type of machinery. Looking to the record before it, the Court concluded there was no general acceptance of guards for stump cutters. By applying Daubert to the expert and the facts, the Court made a preliminary assessment of the reasoning and methodology underlying the expert's proffered testimony. The Court concluded that the testimony was not scientifically valid and would not aid the jury in its fact finding.[17]

Although the District Court was affirmed in *Pestel*, the Eighth Circuit specifically rejected the notion that in all cases an expert must personally test his theories:

> We trust that the District Court does not mean to suggest that all testing performed by someone other than the expert will be legally insufficient for an expert to rely on. In this case, however, we do not believe that the Court's statement was reversible error. We uphold the Court's ruling on other grounds.[18]

In short, an expert's alternative design theory will not be allowed under *Daubert* or Fed. R. Evid. 702 if it amounts to speculation and untried concepts. While the design does not have to be personally tested by the expert, it must have been produced and put to practical use in the industry.

To what extent an expert must show that an alternative design is the most reasonable design available is a question governed by state law. State law also determines if evidence of

---

[17]*Pestel* 64 F.3d at 384.

[18]*Id.* at 384 n. 5.

practicality and feasibility is an essential element of the claim, or, on the other hand, is a factor to be considered by the jury.

### B. Product Liability in Arkansas

Arkansas's strict liability statute provides:

> a) A supplier of a product is subject to liability in damages for harm to a person or to property if:
> (1) The supplier is engaged in the business of manufacturing, assembling, selling, leasing, or otherwise distributing the product;
> (2) The product was supplied by him or her in a defective condition which rendered it unreasonably dangerous; and
> (3) The defective condition was a proximate cause of the harm to person or to property.[19]

In order to establish liability under this statute, a plaintiff must prove that the product, as supplied, was defective so as to render it unreasonably dangerous, and that the defect was the proximate cause of the accident.[20]

Evidence that the forklift was in a defective condition when it left the control of Defendant is an essential element of Plaintiff's proof under Arkansas law.[21] It is the definition of "defective" that is crucial in measuring the reliability of Mr. Berry's testimony. In Arkansas, a

---

[19] Ark. Code. Ann. § 4-86-102.

[20] *Higgins v. General Motors Corp.*, 287 Ark. 390 (1985).

[21] *Yielding v. Chrysler Motor Co.*, 301 Ark. 271, (1990); *Nationwide Rentals Co. v. Carter*, 298 Ark. 97 (1989).

defective condition is a condition that renders a product unsafe for *reasonably foreseeable use and consumption.*"[22]

A product is unreasonably dangerous if it is "dangerous to an extent beyond that which would be contemplated by the ordinary and reasonable user, assuming the ordinary knowledge of the community or similar users as to its characteristics, propensities, risks, dangers, and proper and improper uses, as well as any special knowledge, training, or experience possessed by the user."[23]  That is, a product is defective in Arkansas if it is unsafe for its foreseeable use and it is unreasonably dangerous if the consumer cannot appreciate its risks.

It appears that Arkansas has adopted a consumer expectations test with respect to defectively designed products.[24]  The language of the Arkansas strict liability statute does not mention risk utility balancing and does not require the plaintiff to demonstrate any kind of reasonable alternative design.[25]  In contrast, other states have a risk utility *element of proof* in defective product cases that doesn't exist in the Arkansas scheme.  To better understand the difference, a discussion of this approach is necessary.

Under the risk-utility approach a product is defective as designed *if the magnitude of the danger outweighs the utility of the product*.[26]  For example, the New Jersey Product Liability Statute provides that a manufacturer will not be liable if:

---

[22] Ark. Code Ann. § 16-86-102(a) (Repl. 1996); *E.I. Du Pont de Nemours & Co. v. Dillaha*, 280 Ark. 466 (1983)(emphasis added).

[23] Ark. Code Ann. § 16-116-102(7) (1987).

[24] Robert Thomas, *The Arkansas Products Liability Statue: What Does "Unreasonably Dangerous" Mean in Arkansas?* 50 Ark. L. Rev. 663, 667 (1998).

[25] *Id.* at 666.

[26] *Kelleher v. Lumber*, 891 A.2d 477 (N.H. 2005)(emphasis added).

7

(1) At the time the product left the control of the manufacturer, there was not a practical and technically feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the product; . . . or

(3) The harm was caused by an unavoidably unsafe aspect of the product and the product was accompanied by an adequate warning or instruction as defined in section 4 of this act.[27]

The Mississippi product liability statute is similar:

For a design defect to render a product unreasonably dangerous, the injured party must show that, when the product left the manufacturer's control. . . .there existed a feasible design alternative that would have to a reasonable probability prevented the harm.[28]

Another section of the Mississippi Code offers this definition:

A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.[29]

In Illinois, a plaintiff has to present an alternative design that is "economical, practical, and effective."[30] The relevant inquiry in Maryland is whether a manufacturer, knowing the risks inherent in the product, acted reasonably by putting it on the market. Maryland courts must weigh the utility of the risk inherent in the design against the magnitude of the risk.[31]

The cases cited by Defendant in support of their motion to exclude Mr. Berry's testimony relied upon the risk-utility definition of a defective product. The *Ortiz*[32] case applied New Jersey

---

[27] N .J. S. A. 2A:58C-3(a)

[28] Miss. Code Ann. § 11-1-63(f).

[29] Miss. Code Ann. § 11-1-63(f)(ii).

[30] *Hurley v. Motor Coach Industries, Inc.*, 222 F.3d 377, 390 (2000) (*citing to Baltus v. Weaver Division of Kidde & Co., Inc.*, 557 N.E.2d 580, 586 (Ill. 1990)).

[31] *Nissan Motor Co. Ltd. v. Nave*, 740 A.2d 102 (Md. App. 1999).

[32] *Ortiz v. Yale Materials Handling Corp.*, 2005 WL 2044923 (D. N. J. August 24, 2005).

law; and the *Dhillon*[33] case was decided by the Seventh Circuit, applying Illinois law. The *Guy*[34] case was decided by the Fifth Circuit, applying Mississippi law; and *Tannenbaum*[35] applied Maryland law. These cases are not persuasive because experts in New Jersey, Illinois, Mississippi and Maryland must meet the risk utility definition of a defective product. As shown above, this is not so in Arkansas.

The Eighth Circuit, in *French v. Grove Manufacturing Co.*, considered the Arkansas product statute, and rejected a trial court's instruction that smacked of a risk/utility test. The jury was instructed that the Plaintiff had the burden of proving an alternative safer design is available and feasible, and that the product contained some danger other than the danger posed by all similar products:

> In determining the liability of the manufacturer the state of scientific and technological knowledge available to the manufacturer or supplier at the time the product was placed on the market, rather than at the time of the injury, may be considered as evidence. Consideration may also be given to the customary designs, methods, standards, and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products. *Thus, it is clear that under Arkansas law the existence, practicality, and technological feasibility of an alternative safe design are not necessary elements of the plaintiff's cause of action, but rather are merely factors that may be considered by the jury in determining whether a product was supplied in a defective condition that rendered it unreasonably dangerous.* The district court erred in ruling to the contrary; a new trial is required to correct the error.[36]

Citing *French*, the Fifth Circuit, recently applied Arkansas law in a case that is virtually identical to this one. The Fifth Circuit wrote:

---

[33] *Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2000).

[34] *Guy v. Crown Equipment Corp.*, 394 F.3d 320 (5th Cir. 2004).

[35] *Tannenbaum v. Yale Materials Handling Corp.*, 38 F. Supp. 2d 425, 433 (D. Md. 1999).

[36] *French v. Grove Manufacturing Co.*, 656 F.2d 295, 298-99 (1981). (emphasis added).

In this appeal Crown Equipment Corporation primarily challenges the district court's evidentiary ruling allowing John Sevart, the Plaintiff's expert witness, to testify. The defense focuses on the lack of a scientific methodology for Sevart's testimony that it would be safer for Crown to manufacture the forklift with a door even though it would mean the operator must stay with the machine in a tip-over or off-the-dock accident. However, under Arkansas law, the plaintiff is not required to establish that a safer alternative design exists.[37]

In Arkansas, a plaintiff must show that the product was defective --unfit for its intended use of loading products in a warehouse freezer unit-- and it was unreasonably dangerous-- because Plaintiff did not appreciate the risks to his legs and feet.

In order to meet the burden, the existence of an alternative design is an important consideration, but it is not crucial to Plaintiff's fundamental case. Moreover, Plaintiff does not have to demonstrate that an enclosed operator compartment was a risk-free, feasible design for *all* purposes. Of course, Plaintiff can't offer speculation, i.e. his expert must establish that any recommended design alternative exists and is useful.

According to Mr. Berry, Defendant manufactured an optional rear door and also manufactured a completely enclosed cab for some of its stand up forklifts:

> Crown started providing Chrysler Corporation with rear doors in March 1974. Ford Motor Company started getting rear doors on their Crown stand-up forklifts in April 1983, and continues to purchase rear doors at present. Beginning in 1988, Kmart purchased over one hundred and fifty doors from their Crown forklifts. Other companies including Allied Automotive/Bendix, Caterpillar and Cerro Wire & Cable, DuPont, John Deere, Southern NE Telephone and Tappan have purchased rear doors for their Crown stand-up forklifts.[38]

Mr. Berry reviewed manuals describing an optional rear door for forklifts offered by Yale, Hyster, Schaeff and Raymond. The fact that devices such as rear doors and enclosed cabs have

---

[37]*Walden v. Crown Equipment Corp.*, 2003 WL 21659438 (5th Cir. 2003).

[38]Doc. No. 83-2, p. 5.

been manufactured and placed in service by Defendant and other companies negates assertions based on a lack of testing, and design development.[39]  In short, Mr. Berry is not offering alternative design theories based on speculation -- Defendant has designed and manufactured such devices.

**III.  Conclusion**

Mr. Berry meets the Fed. R. Evid. 702 and *Daubert* standards because his testimony is grounded on technical knowledge which may well be useful to the finder of fact.  Mr. Berry is a qualified mechanical engineer with knowledge of the material handling industry, the standards applicable to forklifts, forklift accident reports, and forklift design history. Whether an alternative design would significantly reduce the risk of injury without impairing the product's utility is a question of fact, not a question of law in Arkansas.

Mr. Berry's alternative design recommendations are based on devices that exist in the working world.  Based on *Jaurequie*,[40] *Dancy*[41] and *Pestel*[42],  Mr. Berry's opinions meet the reliability factors of Rule 702 and *Daubert*, i.e. they are sound enough for a jury to consider them.

Mr. Berry's testimony creates a jury question that the forklift was defective for its intended purpose. Defendant's Motion in Limine is DENIED.

IT IS SO ORDERED this 30th day of March, 2006.

/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE

---

[39]*McPike v. Corghi S.P.A.*, 87 F.Supp. 2d 890 (E. D. Ark. 1999).

[40]*Jaurequie*, 173 F.3d at 1083.

[41]*Dancy*, 127 F.3d at 653-54.

[42]*Pestel* 64 F.3d at 384.